**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MARCEL JUNIOR,

Plaintiff(s),

-against-

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM; BLOCKRATIZE, INC. d/b/a POLYMARKET; SHAYNE RUBEN COPLAN; MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER; and JOHN DOES 1–10 and ABC CORP. 1–10,
Defendant(s).

**SUMMONS**

To the above named Defendant(s):
**ADVENTURE ONE QSS, INC. d/b/a Polymarket.com**
c/o director Shayne Ruben Coplan

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Defendants' residence in New York County under CPLR 503, which is that Defendants Adventure One QSS, Inc. and Blockratize, Inc. maintain their principal place of business in New York County, at least Defendant Shayne Coplan is domiciled in New York County, and a substantial part of the events giving rise to this action occurred in New York County.

BURWICK LAW, PLLC
by: <u>*/s/Rylan Maksoud*</u>
Max Burwick
Rylan Maksoud
43 West 43rd Street, Ste 114
New York, New York 10036
Tel.: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law

*Attorneys for Plaintiff*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MARCEL JUNIOR,

Plaintiff(s),

-against-

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM; BLOCKRATIZE, INC. d/b/a POLYMARKET; SHAYNE RUBEN COPLAN; MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER; and JOHN DOES 1–10 and ABC CORP. 1–10,
Defendant(s).

**SUMMONS**

To the above named Defendant(s):
**BLOCKRATIZE, INC. d/b/a Polymarket**
c/o Corporation Service Company
251 Little Falls Dr
Wilmington DE 19808

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Defendants' residence in New York County under CPLR 503, which is that Defendants Adventure One QSS, Inc. and Blockratize, Inc. maintain their principal place of business in New York County, at least Defendant Shayne Coplan is domiciled in New York County, and a substantial part of the events giving rise to this action occurred in New York County.

BURWICK LAW, PLLC
by: *<u>/s/Rylan Maksoud</u>*
Max Burwick
Rylan Maksoud
43 West 43rd Street, Ste 114
New York, New York 10036
Tel.: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law

*Attorneys for Plaintiff*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MARCEL JUNIOR,

Plaintiff(s),

-against-

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM; BLOCKRATIZE, INC. d/b/a POLYMARKET; SHAYNE RUBEN COPLAN; MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER; and JOHN DOES 1–10 and ABC CORP. 1–10,
Defendant(s).

**SUMMONS**

To the above named Defendant(s):
**SHAYNE RUBEN COPLAN**

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Defendants' residence in New York County under CPLR 503, which is that Defendants Adventure One QSS, Inc. and Blockratize, Inc. maintain their principal place of business in New York County, at least Defendant Shayne Coplan is domiciled in New York County, and a substantial part of the events giving rise to this action occurred in New York County.

BURWICK LAW, PLLC
by: *<u>/s/Rylan Maksoud</u>*
Max Burwick
Rylan Maksoud
43 West 43rd Street, Ste 114
New York, New York 10036
Tel.: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law

*Attorneys for Plaintiff*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MARCEL JUNIOR,

Plaintiff(s),

-against-

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM; BLOCKRATIZE, INC. d/b/a POLYMARKET; SHAYNE RUBEN COPLAN; MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER; and JOHN DOES 1–10 and ABC CORP. 1–10,
Defendant(s).

**SUMMONS**

To the above named Defendant(s):
**MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER**

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is Defendants' residence in New York County under CPLR 503, which is that Defendants Adventure One QSS, Inc. and Blockratize, Inc. maintain their principal place of business in New York County, at least Defendant Shayne Coplan is domiciled in New York County, and a substantial part of the events giving rise to this action occurred in New York County.

BURWICK LAW, PLLC
by: *<u>/s/Rylan Maksoud</u>*
Max Burwick
Rylan Maksoud
43 West 43rd Street, Ste 114
New York, New York 10036
Tel.: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law

*Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

MARCEL JUNIOR,
Plaintiff,

-against-

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.COM; BLOCKRATIZE, INC. d/b/a POLYMARKET; SHAYNE RUBEN COPLAN; MATTHEW MODABBER SOBHANDOST a/k/a MATTHEW MODABBER; and JOHN DOES 1–10 and ABC CORP. 1–10,
Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

-----------------------------------------------------------------------X

Plaintiff Marcel Junior, by his attorneys, Burwick Law, PLLC, for his Complaint against Defendants Adventure One QSS, Inc. d/b/a Polymarket.com, Blockratize, Inc. d/b/a Polymarket, ABC Corp. Defendants 1–10, and John Doe Defendants 1–10 (together, the "Corporate Defendants" or "Polymarket"), and Shayne Ruben Coplan and Matthew Modabber Sobhandost, alleges upon knowledge as to his own acts, and upon information and belief:

**<u>Preliminary Statement</u>**

1. Strategy Inc. (NASDAQ: MSTR) is the largest corporate holder of Bitcoin in the world, famous for one vow: never sell. Between May 26 and May 31, 2026, it sold.

2. Polymarket had asked traders: will Strategy sell any Bitcoin by May 31? "Yes" or "No."

3. On June 1, Polymarket announced the answer was Yes:




4. So why was Mr. Junior paid nothing on his $44,992 "Yes" position?

5. After announcing the unexpected goal, Polymarket moved the goalposts.

6. Polymarket operates what it calls the world's largest prediction market with "[f]air & transparent markets, by design."

7. It sells rules-based resolution and answers: markets "resolved according to the market's pre-defined rules."

8. It advertises that its technology finds truth: that "[m]arkets seek truth," that its prices reflect "accurate, unbiased, and real-time probabilities," and that people use Polymarket "for the most accurate odds."

9. Its business is the wisdom of crowds: collective knowledge in, truth out. Thousands stake money on a question; the market aggregates their choices into a probability/price between zero and one dollar; and when the answer arrives, everyone who was right is paid $1.00 per share.

10. But the advertised value holds only if the last step is honest. None of it matters if the answer key is wrong. Resolution is the step where a prediction market either tells the truth or does not. This case is about a resolution that did not tell the truth.

11. The market at issue asked one binary question: would Strategy sell any of its Bitcoin by May 31, 2026?

12. The "pre-defined" rule was plain. The market would resolve "Yes" if MicroStrategy sold any of its Bitcoin by 11:59 p.m. ET on May 31, and otherwise "No."

> This market will resolve to "Yes" if MicroStrategy sells any of its Bitcoin by 11:59 PM ET on the date specified in the title. Otherwise, this market will resolve to "No".
>
> The primary resolution source for this market will be information from MSTR and on-chain data, however a consensus of credible reporting will also be used.

13. The rule made the sale the event. It did not require that the sale be announced by the deadline, only that it happen by the deadline. It was a question about the world, not the news cycle.

14. The rule named its resolution source: "information from MSTR," the company that reported its Bitcoin activity in SEC Form 8-Ks on Monday mornings. With May 31 falling on a Sunday, the authoritative answer would arrive Monday, June 1.

15. The never-seller sold. On the morning of June 1, Strategy's own SEC filing reported 32 Bitcoin sold, "as of May 31, 2026, 4:00 p.m."

*BTC Update*

On June 1, 2026, Strategy announced updates with respect to its bitcoin holdings:

**During Period May 26, 2026 to May 31, 2026***

| BTC Sold | Aggregate Sale Price (in millions)(2) | Average Sale Price(2) |
|---|---|---|
| 32(1) | $2.5 | $77,135 |

**As of May 31, 2026***

| Aggregate BTC Holdings | Aggregate Purchase Price (in billions)(2) | Average Purchase Price(2) |
|---|---|---|
| 843,706 | $63.87 | $75,699 |

*Bitcoin activity and holdings information is presented as of May 31, 2026, 4:00 p.m. Eastern Time.
(1) Proceeds from the bitcoin sales are expected to be used to fund distributions on preferred stock.
(2) Aggregate sale price and average sale price are net of fees and expenses.

16. The most authoritative proof of the fact, the very "information from MSTR" the rule named as a primary source, arrived. Per the rule, the question's answer was "Yes."

17. Polymarket tried to rewrite the rule instead. At 1:00 p.m. that Monday, after heavy trading on the morning's filing, it posted that "[c]onfirmation achieved outside of the market's time frame does not qualify."

**Additional context** Updated Jun 1

No information from MSTR, on-chain data, or consensus of credible reporting confirmed that MicroStrategy sold Bitcoin within the market's timeframe.

Confirmation achieved outside of the market's time frame does not qualify.

We're aware of the dispute on this market. If a clarification is to be issued, it will be at 1:00 PM ET on June 1. If no statement is issued at that time, then there will be no clarification by the Polymarket team. The orderbook will be cleared at 1:00 PM ET, regardless of whether a clarification is made.

18. That language would have changed the question from whether Strategy sold by May 31 into whether the sale was confirmed by May 31. "Yes" prices/odds collapsed.




19. But Mr. Junior had read the pre-defined rule and Polymarket's advertisements, neither of which let Polymarket move the goalposts to block an unexpected answer.

20. He took Polymarket at its word that "clarifications" "[c]annot change the fundamental intent of the question," that the pre-defined rule controls, and that "shares representing the *correct, final outcome* are paid out $1.00 USDC each upon market resolution."

21. At the time of resolution, Mr. Junior held approximately 44,992 “Yes” shares worth approximately $44,992 at the promised $1.00 a share. He was paid nothing.

22. The loss poses a question larger than one trade. A technology marketed as the most accurate truth finder in the world returned an answer that its own written rule, its own designated resolution source, and the issuer’s own SEC filing all contradict.

23. Either the technology does not do what Polymarket advertises, or the people who run it are able to override the wisdom of the crowd when their accuracy is unexpected. Both possibilities are irreconcilable with what Polymarket sells.

24. Mr. Junior brings this action for breach of contract, breach of the implied covenant of good faith and fair dealing, money had and received (in the alternative), and deceptive practices and false advertising under New York General Business Law (“GBL”) §§ 349 and 350. He seeks not less than approximately $44,992 in damages, plus restitution, statutory and treble damages, injunctive relief, interest, attorneys’ fees, and costs.

## The Parties

25. Plaintiff Marcel Junior is a natural person.

26. Defendant **Adventure One QSS, Inc.** ("Adventure One"), doing business as "Polymarket.com," is an unauthorized foreign corporation organized under the laws of Panama. Adventure One’s principal place of business (nerve center) is in the SoHo neighborhood of Manhattan. Adventure One's Panama presence is an unstaffed shell corporation; its operations, personnel, and management are in New York without authorization from the New York Secretary of State, in violation of NY BCL § 1301.

27. Defendant **Blockratize, Inc.** ("Blockratize"), doing business as “Polymarket,” is a corporation organized under the laws of Delaware with its principal place of business (nerve center) at the same SoHo offices from which Adventure One operates. Blockratize owns the

"Polymarket" name and brand: it is the record owner of the federally registered trademark POLYMARKET, of additional pending POLYMARKET applications, and of the marks THE WORLD'S LARGEST PREDICTION MARKET, POLY, and $POLY, among others.

28. Blockratize developed the Polymarket platform software and, according to public regulatory records, operated Polymarket.com directly from on or about June 16, 2020 until at least January 11, 2022. Following a January 2022 order of the United States Commodity Futures Trading Commission, operation of Polymarket.com was allegedly transferred to Defendant Adventure One QSS, Inc., which licenses Blockratize's software. Defendant Shayne Coplan is both Blockratize's Chief Executive Officer and a director and former President at Adventure One. According to Defendants' Terms of Use, Blockratize developed the Polymarket "Platform" and related Features, is identified as a "Related Party," and is the developer whose software Adventure One licenses. Adventure One is "the Company" that provides the Polymarket Interfaces and Features, including the website located at Polymarket.com, and is the counterparty to the Terms of Use. In reality, this supposedly separate entity structure is false.

29. Defendant **Shayne Ruben Coplan** ("Coplan"), publicly known as Shayne Coplan, is a natural person domiciled in New York County, New York. Coplan is the founder and Chief Executive Officer of Polymarket. With respect to the two entities, he is the Chief Executive Officer of Blockratize and a director and former President at Adventure One. Coplan's New York domicile is a matter of public record: in November 2024, the FBI executed a search warrant at his Manhattan residence and seized his electronic devices, in connection with a Polymarket-related federal inquiry that was closed without charges in July 2025. At all relevant times, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices alleged herein, including Polymarket's public representations and the

drafting, "clarification," and resolution of the Strategy Bitcoin Market. Coplan has ultimate decision-making authority over the Corporate Defendants' business operations and representations at issue under GBL §§ 349 and 350.

30. Defendant **Matthew Modabber Sobhandost** ("Modabber"), publicly known as Matthew Modabber, is a natural person domiciled in either New York or Florida. Since January 2024, he has served as Polymarket's Chief Marketing Officer. At all relevant times, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the marketing and advertising of Polymarket alleged herein, including the representations at issue under GBL §§ 349 and 350. Modabber has directed Polymarket's marketing based in New York, including publicly-reported marketing campaigns promoting fake winnings and paying content creators to post promotions without disclosing the payments. At least $350,000 was routed through Modabber's personal PayPal account to such creators.

31. Defendants John Doe 1–10 and ABC Corp. Defendants 1–10 are individuals or entities, whose true identities are presently unknown to Plaintiff, that own, control, operate, direct, administer, or profit from the Polymarket platform and/or from the resolution of the market at issue, including UMA-related participants, market administrators, and other affiliates. Plaintiff will seek leave to amend to substitute the true names of such defendants when they are ascertained.

32. To its users, Polymarket is one thing: one brand, one website, one market page, one set of rules, one payout. Plaintiff did not knowingly deal with a lattice of affiliated entities; he dealt with Polymarket.

33. The allocation of functions among Adventure One, Blockratize, UMA-related participants, market administrators, and other affiliates is opaque by Defendants' design, and the facts about it sit uniquely in Defendants' hands. Each Defendant is liable for the conduct it

controlled, authorized, ratified, or profited from; in the alternative, Plaintiff pleads agency, apparent authority, ratification, and delegated performance, and, in the further alternative, successor liability and alter ego.

34. The New York nexus for Plaintiff's GBL §§ 349, 350 claims is not merely Defendants' domicile, headquarters, executive presence, or the place from which Defendants' marketing strategy originated. The challenged transaction occurred at least in substantial part in New York because Plaintiff purchased, and held shares in, a rules-based market service whose material platform functions were created, administered, controlled, approved, ratified, or materially performed through Defendants' New York-based operations, including the Market rule, market page, trading interface, order-book administration, Additional Context, resolution framing, resolution ratification, and refusal to redeem Plaintiff's "Yes" shares.

## Jurisdiction and Venue

35. This Court has general personal jurisdiction over Defendants under CPLR 301 because Defendants are "at home" in New York. Blockratize and Adventure One maintain their principal place of business in New York County, and at least Defendant Coplan is domiciled in New York.

36. This Court has specific personal jurisdiction over all Defendants pursuant to CPLR 302 because, at all relevant times, Defendants transacted business within the State of New York, contracted to supply goods or services in the State of New York, and committed tortious acts within the State of New York or caused injury through New York-directed conduct. Defendants maintain or maintained personnel, offices, and operations in New York, including in New York County; used New York-based personnel and operations in connection with Polymarket's marketing, market-rule drafting, clarification practices, platform administration, and resolution architecture; and created, approved, disseminated, or ratified the challenged market rule, advertising, and after-the-fact clarification from New York. Plaintiff's claims arise out of those New York contacts.

37. Venue is proper in New York County under CPLR 503 and 509. Defendants maintain their principal place of business and operations in New York County, where a substantial part of the events at issue occurred, including the advertising, the drafting of the market rule, and the administration and resolution of the market.

## Factual Allegations

### A. Strategy's Vow, a Deadline, and a Question the World Was Watching

38. Strategy Inc., formerly MicroStrategy Incorporated ("Strategy" or "MSTR"), is a publicly traded company and the largest corporate holder of Bitcoin in the world. Its treasury strategy, to accumulate Bitcoin and never sell it, is among the most publicized corporate commitments in modern markets, and whether Strategy would ever part with any of its Bitcoin was a question followed around the world.

39. Strategy reported its Bitcoin activity through official channels on a routine cadence. It routinely disclosed each week's Bitcoin activity through public filings or issuer communications released the following Monday.

40. Against that backdrop, Defendants offered event markets asking whether Strategy would sell any of its Bitcoin by a date certain, across multiple deadlines including May 31, 2026, June 30, 2026, and December 31, 2026. This action concerns the May 31, 2026 market (the "Strategy Bitcoin Market" or the "Market"), identified by condition ID 0x3733a1b647e7364095736ab0966465d896a84cf3b6bc1695ca1f26c3239b3868, with binary "Yes" and "No" outcomes.

### B. The Machine That Sells Truth

41. Polymarket markets itself as an instrument of knowledge: a technology that harnesses the wisdom of crowds to measure reality more accurately than any pundit, poll, or news desk.

42. Its representations to the public, on its website and Help Center, include: that "Polymarket is the world's largest prediction market"[1]; that users can "stay informed and profit from [their] knowledge"[2]; that "[o]ur markets reflect *accurate, unbiased, and real-time probabilities*"[3]; that "[m]arkets seek truth"[4]; that "Prices = Probabilities"[5]; that "prediction markets [are] the best source of real-time event probabilities"[6]; and that "[p]eople use Polymarket for the most accurate odds."[7]

43. On payment, Defendants advertise: "The shares representing the *correct, final outcome* are paid out $1.00 USDC each upon market resolution"[8]; that "[w]hen a market is resolved, holders of winning shares receive $1 per share"[9]; and that "losing shares become worthless."[10]

44. On resolution, Defendants represent that "[m]arkets are resolved according to the market's pre-defined rules"[11]; that markets are "resolved according to the rules set forth on the market page"[12]; and that "[t]he market title describes the market, but the rules define how it should be resolved."[13]

45. On integrity, Defendants represent that they maintain "[r]ules, standards, and the principles that keep markets honest"[14]; that "[t]he system works because traders are motivated to act on their expertise and trust that no one is gaming the outcome"[15]; that they "protect the integrity

---

[1] https://help.polymarket.com/en/articles/13364060-what-is-polymarket.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] https://help.polymarket.com/en/articles/13364518-how-are-prediction-markets-resolved
[10] *Id.*
[11] *Id.*
[12] https://help.polymarket.com/en/articles/13364548-how-are-markets-clarified.
[13] *Id.*
[14] https://integrity.polymarket.com/
[15] *Id.*

of every market outcome"[16]; and that Polymarket offers "[f]air & transparent markets, by design."[17]

46. These representations are uniform, consumer-oriented, and directed to the public at large. Plaintiff reviewed and relied on Polymarket's representations in choosing to trade on Polymarket and in purchasing his "Yes" shares.

47. The representations also define the product. What Polymarket sells is not the thrill of chance; it is rules-based resolution: the promise that a fixed, pre-announced standard, not the operator's later preference, determines who is paid.

**C. Polymarket's Private Vocabulary**

48. Polymarket describes its product in a vocabulary of its own. The words sound like the language of ordinary financial markets. They are not. Set out below are the platform's principal terms as Polymarket uses them, next to what the same functions are called, and how they are constrained, in the traditional markets whose credibility the words borrow.

49. "Event market." Polymarket uses the term for a tradeable question about a future real-world event, with "Yes" and "No" positions. In traditional terminology this would be a binary option, a fixed-payout derivative. On a traditional exchange, such an instrument trades under contract specifications fixed at listing; the exchange cannot quietly rewrite the specifications of a contract while positions in it remain open as Polymarket can through "clarifications." Outside of emergencies, a substantive amendment must be filed with the exchange's regulator and posted publicly before it takes effect, and certain material changes to contracts with open positions require the regulator's prior approval.

[16] *Id.*
[17] *Id.*

50. “Shares.” Polymarket uses the word for the Yes and No positions themselves, each redeemable at $1.00 if correct. In traditional markets, a position in such an instrument is called what it is: a contract. A "share" traditionally denotes ownership of an enterprise, with governance and disclosure duties attached. Polymarket's "shares" own nothing. They are fixed-payout claims against a pool of stakes. The borrowed word supplies the reassurance of the securities markets without any of their protections.

51. “Rules.” Polymarket uses the term for the resolution criteria posted on each market page: the text that, by Polymarket’s own account, “define[s] how [the market] should be resolved.” The traditional analogue is a contract specification published before trading begins and alterable while open only through the advance, public regulatory process described above, and drafted so that settlement requires as little discretion as possible. The law of contracts adds one more safeguard: ambiguity in a standard-form specification is construed against its drafter.

52. “Resolution.” Polymarket uses the term for the determination of a market’s outcome and the payment of winners. The traditional term is final settlement, and its defining feature is that it is designed to be ministerial: a designated fact or price is looked up and applied.

53. “Resolution source.” Polymarket uses the term for the authority a market’s rules designate for determining the outcome. The traditional analogue is a settlement reference, and it is fixed in advance for a single reason: so that no one can go shopping for a different answer after the outcome is known.

54. “Clarification.” Polymarket uses the term for language the platform may post about an open market’s meaning, upon which, by Polymarket’s own policy, “the order book is cleared”[18] and “all resting orders [are] cancelled.”[19] Traditional market vocabulary has no equivalent term,

---

[18] https://help.polymarket.com/en/articles/13364548-how-are-markets-clarified.
[19] *Id.*

because a traditional exchange cannot do what a "clarification" does: change the meaning of a contract people already hold by posting a note. Outside of emergencies, an amendment to a listed contract's terms must be filed with the CFTC and posted publicly at least ten business days before it takes effect, subject to the Commission's power to stay it; a material change to certain contracts with open positions requires the Commission's prior approval. The order-book-clearing policy is Polymarket's own acknowledgment that a "clarification" changes the thing being traded.

55. “UMA Optimistic Oracle.” Polymarket represents that its markets are “resolved by the UMA Optimistic Oracle . . . in accordance with a Contract’s pre-defined rules.” What the term evokes is independent, automated verification of the outcome. The mechanism is neither.

56. A disputed outcome is decided not by a machine but by a vote of anonymous, self-selected holders of UMA tokens, concentrated private parties whose voting power is weighted by the value of the tokens they stake. A May 2026 Bloomberg analysis found that just nine anonymous wallets have "effectively gained control over who wins and loses" Polymarket's contested markets.[20]

57. Nothing in the system bars UMA participants from owning multiple wallets or from holding positions in the very market they decide. By the UMA system's own design, their financial incentive is agreement, not accuracy: voters who side with the majority collect rewards, while voters who dissent or abstain are financially penalized.

58. Defendants have also implemented backdoors that allow them to manually divert and unilaterally resolve contracts outside the UMA process.

---

[20] Carolyn Silverman, Emily Nicolle & Demetrios Pogkas, *Crypto Whales Dominate Polymarket Disputes Worth $5 Billion*, Bloomberg (May 26, 2026), https://www.bloomberg.com/news/articles/2026-05-26/crypto-whales-dominate-polymarket-disputes-worth-5-billion.

59. And the house frames everything this process decides: Polymarket drafts the rule the oracle reads, frames the question the oracle is asked, and posts the "clarifications" the oracle's voters are expected to follow.

60. The pattern across these definitions is uniform. Each term imports the credibility of a regulated market function while quietly omitting the safeguard that gives the traditional term its meaning: specifications fixed in advance, settlement designed to be ministerial, a reference source chosen before trading begins, and term changes that are public, prospective, and regulator-supervised rather than silent and retroactive.

61. These definitions matter here because the market at issue was resolved through precisely the gap the vocabulary conceals: a "resolution" that was anything but ministerial, declaring unconfirmed an event the rule's own primary source had confirmed, under a confirmation-timing condition the posted "rules" never contained.

**D. The Rule: The Sale Was the Event**

62. The Strategy Bitcoin Market's written rule was short and unconditional. It provided, in relevant part:

> This market will resolve to "Yes" if MicroStrategy sells any of its Bitcoin by 11:59 PM ET on the date specified in the title. Otherwise, this market will resolve to "No."[21]

63. The rule then said where the answer would come from:

> The primary resolution source for this market will be information from MSTR and on-chain data, however a consensus of credible reporting will also be used.[22]

64. By its plain terms, the rule asked one factual question and supplied one operative condition: whether Strategy sold any of its Bitcoin on or before 11:59 p.m. Eastern Time on May

---

[21] https://polymarket.com/event/microstrategy-sell-any-bitcoin-in-2025/microstrategy-sells-any-bitcoin-by-may-31-2026.
[22] *Id.*

31, 2026. The sale itself, not the date on which the sale was announced, reported, or confirmed, was the operative event.

65. What the rule did not say matters as much as what it did. It contained no requirement that the sale be publicly announced by the deadline, no requirement that the designated sources publish by the deadline, and no exclusion for proof arriving after the deadline.

66. The rule's design confirms as much: it named "information from MSTR" as the primary source even though, as anyone following Strategy knew, Strategy reported each week's Bitcoin activity the following Monday, and May 31, 2026 fell on a Sunday. Under the issuer's own publication cadence, the authoritative answer to the Market's question was always going to arrive on Monday, June 1.

67. Polymarket's interface and underlying market data also displayed a July 1, 2026 estimated or administrative end date and directed users to the Market's rules for specific resolution details. The month between the May 31 event deadline and that administrative close accommodated exactly this gap between event and confirmation.

68. Defendants' own customer-service interface said similar. In response to a user inquiry, Polymarket's "Polybot" stated that official confirmation of an event that occurred before the market deadline but was published during an active dispute "can be valid evidence" if submitted during the dispute period, and that new evidence arising during the dispute period "can be taken into account" for resolution.

69. The question was narrow and binary. It did not ask how much Strategy sold, at what price, or on what terms. It asked whether Strategy sold any of its Bitcoin by the deadline. It did, or it did not.

### E. Strategy Sold, and the Issuer Itself Said So

70. Strategy sold Bitcoin within the Market's timeframe. On June 1, 2026, at approximately 8:00 a.m. ET, Strategy filed with the SEC a Current Report on Form 8-K disclosing updates with respect to its Bitcoin holdings (the "SEC Filing").

71. The SEC Filing identified the relevant period as May 26, 2026 through May 31, 2026. For that period, it reported "BTC Sold" of 32, an aggregate sale price of approximately $2.5 million, and an average sale price of approximately $77,135 per Bitcoin.[23] It stated that the Bitcoin activity and holdings information was presented "as of May 31, 2026, 4:00 p.m. Eastern Time."[24]

72. The SEC Filing thus confirmed that Strategy sold Bitcoin on or before 11:59 p.m. Eastern Time on May 31, 2026. This was not rumor, speculation, or mere on-chain inference. It was the company's own official disclosure, filed with the SEC: "information from MSTR," the very source the rule designated as a primary source.

73. Polymarket confirmed it too. On June 1, 2026, at 8:11 a.m. ET, approximately 11 minutes after the SEC Filing, Polymarket's own X account, @PolymarketMoney, told its followers: "$MSTR sold 32 Bitcoin for ~$2.5M last week."

---

[23] Strategy Inc., Current Report (Form 8-K), Item 8.01 (June 1, 2026), https://www.sec.gov/Archives/edgar/data/1050446/000119312526249768/mstr-20260530.htm.
[24] *Id.*




74. On the narrow question the Market posed, there was nothing left to interpret. The operative condition was satisfied, the issuer itself had documented it, and the only supportable resolution was “Yes.”

**F. Polymarket Rewrote the Question After the Answer Arrived**

75. The resolution process, however, had started before the answer could arrive. On or about May 31, 2026, at approximately 8:00 p.m. ET, a “No” resolution was proposed through the UMA process and then disputed, extending the resolution process for approximately three days while trading continued.

76. On the morning of June 1, 2026, at approximately 8:00 a.m. ET, the SEC Filing became public. "Yes" prices rose sharply, and substantial trading followed. The majority of the Market's total volume occurred after the issuer's confirmation and before Defendants' 1:00 p.m. ET post hoc "Additional Context."

77. At approximately 9:00 a.m. ET on June 1, Defendants posted a notice stating that any clarification would be issued at 1:00 p.m. ET. They asserted that if no statement was issued then, no clarification would be made and the order book would be cleared at 1:00 p.m. ET regardless.

78. At approximately 1:00 p.m. ET on June 1, 2026, after the SEC Filing and after substantial post-filing trading, Defendants posted new "Additional Context" stating that:

> no information from MSTR, on-chain data, or consensus of credible reporting confirmed that MicroStrategy sold Bitcoin within the market's timeframe[25]

and that:

> [c]onfirmation achieved outside of the market's time frame does not qualify.[26]

79. That language did not appear in, and cannot be squared with, the rule Plaintiff traded. The rule turned on whether Strategy sold Bitcoin by May 31. The new language turned on whether the sale was publicly confirmed by May 31. Those are two different conditions.

80. The sale is the event; confirmation is evidence of the event. Defendants used the timing of the proof to defeat the proof of timing.

81. "Yes" prices collapsed within minutes of the 1:00 p.m. posting. On or about June 3, 2026, after the extended dispute period, the UMA process resolved the Market "No."

---

[25] https://polymarket.com/event/microstrategy-sell-any-bitcoin-in-2025/microstrategy-sells-any-bitcoin-by-may-31-2026.
[26] *Id.*

82. Defendants' own clarification policy provides that a clarification "[c]annot change the fundamental intent of the question."[27] The fundamental intent of this question was whether Strategy sold Bitcoin by the deadline. The 1:00 p.m. ET language substituted a different question: whether the sale was confirmed by the deadline.

83. The after-the-fact language was posted only once the outcome was known and was crafted to align precisely with the "No" result. The change was outcome-driven, not a good-faith application of a pre-defined rule.

84. Who drafted the "clarification," who approved it, whether the order book was in fact cleared, and who benefited are facts in Defendants' possession. Discovery will supply them.

**G. Plaintiff Took Polymarket at Its Word**

85. Plaintiff followed Strategy's disclosures and read the Market's rule as written. The rule made the sale the event, and it made "information from MSTR" the primary source of the answer.

86. After the June 1 SEC 8-K filing, trading remained open but the event risk had passed. What remained was only the risk that Polymarket would not follow its own rule, a risk Polymarket's advertising promised did not exist.

87. On or about June 2, Mr. Junior purchased approximately 44,992 "Yes" shares for an aggregate cost of approximately $169. Each of the seven transactions is recorded on the Polygon blockchain.

88. At the time of resolution, Mr. Junior's position, correctly resolved, was worth approximately $44,992.

**H. The Machine Declared the Proven Unproven**

89. The Market resolved "No." The side the rule required to win was paid nothing, and Plaintiff's correct position was made worthless.

---

[27] https://docs.polymarket.com/concepts/resolution

90. The resolution cannot be squared with the rule. The rule made the sale the operative event; the sale occurred by May 31. The rule named "information from MSTR" as the primary resolution source; that source confirmed the sale. The rule contained no confirmation-by-deadline requirement; Defendants supplied one after the answer arrived.

91. Nor can the resolution be squared with Defendants' own conduct afterward. Following the disputed resolution, a member of Polymarket's team publicly responded to criticism of the "recent MicroStrategy market drama," including that Polymarket had ignored traders before May 31, was not transparent about how it "clarified" the Market, allowed trading to continue during the resolution controversy, and continued collecting fees during the dispute.

92. Posting from the Polymarket-branded account @mustafap0ly, the employee replied that he "totally agree[d]" and that Polymarket was "changing a bunch of stuff internally to make sure this doesn't happen again."

93. That Polymarket pledged to fix its own internal processes so "this doesn't happen again" supports the inference that Defendants located the cause of the dispute in their own market-rule, clarification, trading, and resolution practices, not in any independent determination of the UMA oracle.

94. The harm was market-wide. On-chain data compiled from a snapshot taken immediately before Defendants' 1:00 p.m. ET rule change shows approximately 1,868 traders holding one or more "Yes" shares at that time, approximately $3,821,349 in aggregate estimated user funds lost on a cost-basis methodology, and approximately $6,525,846 in value had the Market resolved correctly. The challenged conduct was consumer-oriented and affected the public-facing Market as a whole, not merely Plaintiff.

## I. Either the Technology Failed, or It Was Overridden

95. Polymarket's entire pitch is that its technology converts the knowledge of crowds into the most accurate picture of reality available anywhere. This Market put that pitch to the simplest possible test: a binary question, an explicit rule, and the issuer's own SEC filing. It produced an answer that the rule, the filing, and Defendants' own designated source all contradict.

96. There are only two explanations, and each condemns the product as sold. If the resolution machinery, including the UMA oracle process Defendants invoke, faithfully applied the rule and still produced "No," then the technology does not find truth, and the advertising is false.

97. If instead the machinery produced "No" because of how Defendants framed, administered, or ratified the outcome, including through the after-the-fact "Additional Context" that supplied the answer, then the "wisdom of crowds" is subordinate to the operator's discretion, and the advertising is false in a more troubling way.

98. Users cannot tell which explanation is true, because Defendants built the resolution architecture and keep its workings opaque. Who framed the question, who proposed and evaluated the outcome, and who ratified it are facts in Defendants' possession.

99. What is already clear is the incentive problem. A prediction market's operator profits from activity on the platform regardless of which side wins, unless the operator also controls resolution, in which case every disputed market is an opportunity to decide who gets paid.

100. Defendants derived fees and other benefits from the Strategy Bitcoin Market, including while trading continued through the dispute period itself.

101. Event risk is a legitimate feature of a prediction market. Resolution risk, the risk that the platform will not follow its own written rule, is not. Plaintiff accepted the first. Nothing in Polymarket's advertising, and nothing in the Market's rule, asked him to accept the second.

**J. Defendants Control the Platform and the Resolution**

102. By their own Terms of Use, Adventure One provides the Polymarket "Interfaces" and "Features"; Blockratize "developed" the "Platform"; and Adventure One licenses Blockratize's software.[28]

103. Defendants reserve to themselves sweeping discretion and control over the platform. By the terms of their own Terms of Use, Defendants may "modify, substitute, eliminate, restrict access to, or add to" the Site, the Interfaces, and the Features "at any time," "with or without notice," including by "deleting or otherwise materially modifying content and information"; may suspend or disable the Features; may act "to only allow open contracts to be closed"; and may determine, "in [their] discretion," whether trading activity is abusive, improper, or disruptive. Defendants (or their licensors) "own all right, title, and interest" in the Site, Interfaces, Features, content, and technology.[29]

104. Defendants' representation that Contracts are "resolved by the UMA Optimistic Oracle . . . in accordance with a Contract's pre-defined rules"[30] does not diminish Defendants' control; it confirms it. Defendants, not the oracle, draft the market rule, draft and post the "clarifications" that define the question the resolution process is asked to decide, and control all aspects of the market and trading.

105. The oracle does not write the rule or decide what a market means; it responds to the rule, the clarification, and the framing that Defendants supply. By drafting and posting the after-the-fact "clarification" in the Strategy Bitcoin Market, Defendants controlled the very input that produced the "No" resolution. Defendants cannot outsource responsibility for a rule they rewrote.

---

[28] https://polymarket.com/tos.
[29] https://polymarket.com/tos.
[30] *Id.*

106. The resolution of the Strategy Bitcoin Market turned on conduct that only Defendants controlled. One or more Defendants drafted and approved the Market's rule; controlled the market page and the order book; posted the 1:00 p.m. ET "Additional Context"; framed the resolution question presented through the UMA process; decided that the Market would not resolve "Yes"; decided that trading would remain open throughout; accepted, ratified, or gave effect to the "No" outcome; and profited from the Market. How those functions were allocated among Defendants is known only to Defendants.

107. Each Defendant is directly liable for the conduct it controlled. No corporate form need be disregarded to hold an entity responsible for its own acts.

108. Defendants drafted both the Terms of Use and the market-specific rules. The Terms recognize event-based Contracts and state that Contracts resolve by pre-defined rules. The market rule, the promise Plaintiff actually traded on, is the operative contract term here. Plaintiff reserves all objections, including formation, to the Terms of Use.

**K. Damages**

109. Plaintiff was damaged in an amount of not less than approximately $44,992 exclusive of fees, interest, and costs. In the alternative, Plaintiff seeks restitution of his net acquisition cost, exclusive of fees, interest, and costs.

**<u>First Cause of Action</u>**

**(Breach of Contract Against the Corporate Defendants)**

110. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

111. The Market's rule, together with the rest of the Polymarket platform, formed a binding, enforceable contract between Plaintiff and the Corporate Defendants. The Market rule was the operative bargain: it fixed the question, the operative event, the deadline, the resolution sources, and the payout.

112. Under that contract, the Market was required to resolve "Yes" if Strategy sold any of its Bitcoin by 11:59 p.m. Eastern Time on May 31, 2026, and winning "Yes" shares were required to redeem at $1.00 per share.

113. Plaintiff performed his obligations, including by paying for and holding his "Yes" shares.

114. The condition for a "Yes" resolution was satisfied. Strategy sold Bitcoin within the Market's timeframe, as confirmed by the issuer's own SEC Filing, the primary resolution source the rule itself designated.

115. The Corporate Defendants breached by resolving, or causing the Market to resolve, "No"; by refusing to honor winning "Yes" shares at $1.00 per share; and by imposing, after the fact, a confirmation-by-deadline condition the rule never contained.

116. Plaintiff has been damaged in an amount to be determined at trial, not less than approximately $44,992 plus interest, fees, and costs.

**Second Cause of Action**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Corporate Defendants)**

117. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

118. Every contract under New York law carries an implied covenant of good faith and fair dealing: neither party may act to destroy or injure the other's right to receive the fruits of the contract.

119. The Corporate Defendants held discretion and practical control over the Market's administration: the presentation of the rule, the drafting and posting of any "clarification" or "Additional Context," the framing of any question submitted to the UMA process, the timing and manner of resolution, and the content of the market page.

120. Discretion is not a license to nullify the bargain. The Corporate Defendants were bound to exercise their control consistent with the parties' reasonable expectations, not to convert a sale-by-deadline condition into a confirmation-by-deadline condition after the sale had occurred and the truth had arrived.

121. The Corporate Defendants breached the covenant by using their control to supply the after-the-fact condition and to give effect to a "No" resolution that the rule foreclosed, depriving Plaintiff of the fruits of his contract.

122. The breach was arbitrary, irrational, and in bad faith, as shown by the direct conflict between the resolution and the rule; the timing of the "Additional Context," posted only after the issuer's confirmation and aligned precisely with the "No" result; and the Corporate Defendants' own public acknowledgment, through a Polymarket-branded account, that internal practices needed to change so "this doesn't happen again."

123. Plaintiff has been damaged in an amount to be determined at trial, not less than approximately $44,992 plus interest, fees, and costs.

**<u>Third Cause of Action</u>**

**(Money Had and Received / Unjust Enrichment, In the Alternative, Against the Corporate Defendants)**

124. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

125. This claim is pleaded in the alternative, should no enforceable contract be found to govern the Market's resolution and payout.

126. Plaintiff's transactions were informed positions on a verifiable real-world fact, an objective corporate event documented by the issuer itself, not games of chance, and they are not void as wagers. If any contract is nonetheless deemed void or unenforceable, equity forbids the Corporate Defendants from keeping the money.

127. Plaintiff paid money for "Yes" shares in the Market. The Corporate Defendants received, held, or controlled those funds and the funds staked in the Market, and drew fees and other benefits from its operation, including during the dispute period.

128. Because Strategy sold Bitcoin within the Market's timeframe, Plaintiff held the winning position. The Corporate Defendants retain money that in equity and good conscience belongs to him: the value owed his winning shares, or at minimum the sums he paid.

129. Plaintiff is entitled to restitution in an amount to be determined at trial.

**Fourth Cause of Action**

**(Deceptive Acts and Practices Under GBL § 349 Against All Defendants)**

130. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

131. GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or the furnishing of any service, in New York.

132. Defendants' conduct is consumer-oriented: they market and operate the platform to the public at large on standardized terms and representations, and the challenged conduct affected the public-facing Market as a whole, including the approximately 1,868 traders who held "Yes" positions immediately before the 1:00 p.m. ET rule change, not Plaintiff alone.

133. Defendants' unfair, deceptive, or abusive acts and practices occurred in New York because the challenged conduct was part of a New York-administered platform transaction, not merely advertising or corporate policy that originated in New York. Defendants created and disseminated the representations at issue from New York and drafted, approved, administered, disseminated, or ratified the Market rule, the market page, the trading interface, the order-book and clarification process, the after-the-fact Additional Context, the resolution framing, the "No" resolution, and the refusal to redeem Plaintiff's "Yes" shares through Defendants' New York-

based operations. Plaintiff's injuries arise from those New York-administered transaction functions.

134. Defendants' acts were materially misleading. They sold a rules-based, truth-seeking market, one that resolves by pre-defined rules and pays the correct side $1.00, while retaining and exercising the practical ability to resolve markets in defiance of those rules. They represented that the Strategy Bitcoin Market would resolve by its stated rule, and resolved it under a different condition supplied after the answer was known.

135. The deception is not merely the "No" resolution. It is the sale of a truth technology whose output the operator can override, a material fact no reasonable consumer was told.

136. Defendants' practices were likely to mislead a reasonable consumer acting reasonably under the circumstances, and they injured Plaintiff: he lost the value of his winning shares and the sums he paid for them.

137. Under GBL § 349(h), Plaintiff is entitled to actual damages, statutory and treble damages, attorneys' fees and costs, and an injunction barring Defendants from marketing rules-based, truth-seeking prediction markets while retaining and exercising the ability to resolve markets in disregard of their pre-defined rules.

**Fifth Cause of Action**

**(False Advertising Under GBL § 350 Against All Defendants)**

138. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

139. GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce, or the furnishing of any service, in New York.

140. Defendants advertised, among other things, that "[m]arkets seek truth"; that "[o]ur markets reflect *accurate, unbiased, and real-time probabilities*"; that "Prices = Probabilities"; that "[m]arkets are resolved according to the market's pre-defined rules"; that "the *correct, final*

*outcome*" is "paid out $1.00 . . . each upon market resolution"; and that Polymarket offers "[f]air & transparent markets, by design."

141. Those advertisements were false and materially misleading. Defendants could, and here did, resolve a market against its own pre-defined rule, declaring "No" an outcome that the rule, the rule's designated primary source, and the issuer's own SEC filing all foreclosed, and denying payment to the correct side.

142. Defendants created and disseminated the advertising in and from New York.

143. Defendants' false advertising occurred in New York because the challenged advertisements were part of the same New York-administered platform transaction alleged above. The advertisements were not merely brand statements originating in New York and later viewed elsewhere; they were public-facing representations used to induce participation in a rules-based Market whose rule, administration, clarification, resolution, ratification, and payout refusal were materially performed through Defendants' New York-based operations.

144. The advertisements were likely to mislead a reasonable consumer, and Plaintiff reasonably relied on them in purchasing his "Yes" shares.

145. Plaintiff suffered actual injury, the value of his winning shares and the sums paid for them, and is entitled to actual damages, statutory and treble damages under GBL § 350-e, attorneys' fees and costs, and injunctive relief.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants, jointly and severally:

(a) Awarding compensatory damages in an amount to be determined at trial, but not less than approximately $44,992;

(b) In the alternative, awarding restitution of the money had and received by Defendants, in an amount to be determined at trial;

(c) On the Fourth and Fifth Causes of Action, awarding statutory and treble damages as permitted by GBL §§ 349(h) and 350-e;

(d) Enjoining Defendants, pursuant to GBL § 349(h), from continuing the deceptive practices alleged herein, including marketing rules-based, truth-seeking prediction markets while retaining and exercising the ability to resolve markets in disregard of their pre-defined rules;

(e) In the alternative, awarding specific performance requiring Defendants to honor Plaintiff's winning "Yes" position at $1.00 per share;

(f) Awarding pre-judgment and post-judgment interest pursuant to CPLR 5001, 5002, 5003, and 5004;

(g) Awarding Plaintiff his reasonable attorneys' fees and costs of suit, including as permitted by GBL §§ 349(h) and 350-e; and

(h) Granting such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

BURWICK LAW, PLLC

By: *<u>/s/Rylan Maksoud</u>*
Max Burwick
Rylan Maksoud
43 West 43rd Street, Ste 114
New York, New York 10036
Tel.: (646) 762-1080
max@burwick.law
rylan.maksoud@burwick.law

*Attorneys for Plaintiff*